THE EXECUTORS OF JAMES C. LORD, deceased, et al.

*v.*

THE CARBON IRON MANUFACTURING COMPANY.

1. For a simple trespass, which is complete when the force by which it is committed ceases, and which is continuous in nothing but the consequences which may flow from it subsequent to its commission, the only remedy known to the law is an action of trespass, in which the person injured must recover his damages once for all.

2. The jurisdiction of courts of equity, in cases of trespass, is purely preventive—they may restrain a threatened trespass, if the injury likely to ensue will be irreparable, or they may enjoin the continuance or repetition of a trespass, but, for a completed trespass, which, as a legal wrong, is complete when protection is sought, they can give no redress whatever.

3. A court of equity cannot award pecuniary damages in redress of a trespass.

4. A court of equity has no authority to impose an easement on the land of a trespasser in redress of the wrong done by the trespass.

5. As a general rule, the only legal duty which a trespasser incurs by his wrongful act, where his trespass is complete when judicial aid is invoked, is a liability to re-imburse the person injured, in money, for the loss which his trespass has caused.

6. If an upper mine owner breaks through a barrier, which was left by the lower mine owner for the purpose of protecting his mine against the water, which otherwise would flow from the upper into the lower mine, the trespasser is answerable for the damages, including the cost of restoring the barrier, but

the trespass, in such case, imposes no legal duty upon the trespasser to either close the opening, or to prevent the water in his mine from flowing through the opening into the lower mine.

7. The flowage of water from the upper mine into the lower, through an opening thus made, is neither the continuance of a trespass, nor of a nuisance, and gives no distinct ground of action.

8. If the damages resulting from a trespass are aggravated or increased by the folly, willful obstinacy, or gross carelessness of the injured person, such part of his loss as is directly attributable to his own fault cannot be recovered.

9. Where one person makes a grant of land to another, reserving the minerals in the land, a covenant will be implied, in the absence of all words to that effect, and solely from the nature of the transaction, that the grantor, in removing the minerals reserved, shall leave or provide sufficient support for the surface, to prevent its subsidence.

10. Land on a lower level is under a natural servitude to that located above it, to receive the water flowing down to it naturally.

11. For damages resulting from natural causes, or from lawful acts done in a proper manner, the law gives no redress, such losses being regarded as *damnum absque injuria*, but where one of two adjoining mine owners conducts water into his neighbor's mine, which would not otherwise go there, or causes it to go there at different times, and in greater quantities than it would go there naturally, he commits a legal wrong.

12. The owner of mineral land has a right to take away the whole of the minerals in his land, for such is the natural course of user of such land, and if, in the course of such user, water accumulates on his land, either on the surface or under ground, and then passes off, by the operation of the laws of nature, into the land of his neighbor, his neighbor has no legal cause of complaint.

On final hearing on bill and answer and proofs taken in open court.

*Mr. S. H. Little* and *Mr. Theodore Little*, for complainants.

*Mr. Henry C. Pitney*, for defendants.

VAN FLEET, V. C.

The questions in dispute in this case relate to the rights and duties of persons owning adjoining mines. The litigants own adjacent iron mines in the county of Morris. They have both worked the same vein of ore, but at different levels, and at different times, the defendants' mine being above that of the com-

plainants', and having been first worked in order of time. The main purpose of the complainants' suit is to procure a decree which will protect them against injuries which they allege they now suffer from the flowing of water from the defendants' mine into theirs, and which will also give them protection against injuries, which they say they will inevitably sustain in the future, if the defendants are allowed to do what they threaten, namely, reduce the pillars and walls of their mine, and let its surface subside. The complainants ask protection, it will be observed, against both present and prospective injury.

The facts on which the complainants rest their right to be relieved against present injury may be summarized as follows: The Carbon Iron Company were the predecessors in title of the defendants; they owned the mine now owned by the defendants up until June, 1878, when, under a decree of this court directing the sale of certain mortgaged premises, this mine, with other lands, was conveyed to the defendants. The Carbon Iron Company, while they owned the defendants' mine, worked over the boundary line and took ore from the complainants' land. The time when this trespass was committed is not fixed with entire certainty. The bill does not allege when it was committed—it simply says that the Carbon Iron Company, while they were in possession, committed a trespass by working over the line; the answer, however, says that it was committed somewhere about the year 1872, and the proofs render it tolerably clear that it was committed near that time—certainly prior to 1875. The point where it was committed is about one hundred feet, measured vertically, below the surface. There is a dispute between the parties as to the true location of the division line, and a large amount of evidence was submitted by each in support of their respective claims, but, without expressing an opinion as to which claim is vindicated by the evidence, I shall, for the purposes of this discussion, treat the line claimed by the complainants as the true one. Adopting their line as the true one, the wrongful act of the Carbon Iron Company, which the complainants seek to make, in part, the basis of the relief they ask against the defendants, consisted in making an excavation or

Lord v. Carbon Iron Manufacturing Co.

hole in the complainants' land, one hundred feet below the surface, for a distance of about forty-seven feet beyond the property line. A second trespass was committed in 1881. The defendants' lessees were the wrong-doers in this instance. This trespass was committed at a point about two hundred feet, vertical measurement, below the surface, and consisted in making an excavation beyond the division line for a distance of about thirty feet.

The two wrongful acts just described form the sole foundation of the complainants' right to relief against present injury. Neither the defendants, nor those who preceded them in title, nor those who have succeeded to any of their rights, have, by the exercise of force or violence, committed any other wrong against the complainants. It is not claimed that these trespasses, at the time they were committed, did the complainants any immediate, irreparable injury, or even serious harm, but it is consequences which have since flowed from them—consequences produced by the complainants' own subsequent acts—which have inflicted the injuries against which they ask protection.

The complainants did not begin to open their mine until the fall of 1880. They then sunk a shaft at a point where they knew it must, if carried down on the vein, strike the excavation which the Carbon Iron Company had previously made in their land, and that an opening between the two mines would thus be made, and that when it was made the inevitable result would be, if no barrier was erected to bay back the water rising in the defendants' mine, that the water would flow down into their mine. The location of their shaft was judiciously selected. It was placed where it could be constructed with the least expense and be used to the greatest advantage. Their superintendent, however, says—and he is the person who selected the site for the shaft—that he expected, when he located the shaft, that in sinking it he would break into the excavation made by the Carbon Iron Company, and that he knew if he did an opportunity would be afforded to the complainants to turn the water rising in their mine, above that point, into the defendants' mine; and he also

Lord v. Carbon Iron Manufacturing Co.

says that he thought, if at any subsequent time it should become necessary to protect the complainants' mine against the water rising in the defendants' mine, that he could do it by building a dam across the opening. The first opening between the two mines was made in sinking the shaft, in the manner in which the complainants' superintendent expected it would be made. And the second was made by the complainants' miners in blasting. A hole was drilled immediately above where the second excavation across the line had been made, and was then charged with powder and fired. The blast was not successful. Two of the complainants' miners say that they supposed the reason why it was not successful was that the bottom of the drill-hole happened to be near a crevice or fissure in the rock, and that when the powder exploded the force produced spent itself in this opening. A new bottom was then made for the hole and it was again charged with powder, and when this second charge exploded, a hole as large as a man's head was made between the two mines. This hole was afterwards enlarged by the use of picks so that an ordinary person could pass through it from one mine to the other. At the time this last opening was made, the complainants' mine had no means of ventilation except through its shaft and the upper opening made into the defendants' mine. One of the miners, who assisted in making the second opening, says that the complainants' mine needed ventilation, and that after the second opening was made its ventilation was much better than it was before.

The surface above the mines is low and wet, and they both, consequently, carry a large quantity of water. They are both wet mines. Through the two openings made in the manner just described, all the water rising in the defendants' mine, above the openings, is given a free passage into the complainants' mine, and it is against the injury inflicted by this flowage that the complainants ask protection. They insist that upon the facts above stated they are entitled to an injunction restraining the defendants from permitting the water rising in the defendants' mine from flowing through these openings into theirs. The complainants' right to the relief they ask, it will be perceived, stands dis-

11

tinctly and exclusively on two simple trespasses, neither of which
was committed by the defendants.

The material question, then, would seem to be, Has this court
any power, for injuries like those from which the complainants
are now suffering, and which proceed from causes like those
which produce the complainants' injuries, to give redress by the
exercise of its prohibitory power? For a simple trespass which,
as a legal wrong, is complete when the force by which it is com-
mitted ceases, and which is continuous in nothing but the conse-
quences which may flow from it subsequent to its commission,
the only remedy known to the law is an action of trespass, in
which the person injured must recover his damages once for all.
The damages recovered in a suit founded on such a cause of
action, extinguish the cause of action, and the sum recovered
must therefore necessarily embrace compensation for all the
injury, whether it be past, present or future, certain or contingent,
known or unknown. Courts of equity, in cases of trespass, exer-
cise a limited and not a general jurisdiction. They may prevent
or stop a trespass, but they cannot otherwise redress a wrong of
that kind. They may restrain a threatened trespass, if the
injury likely to ensue will be irreparable, or they may enjoin the
continuance or repetition of a trespass; but for a completed tres-
pass, which is finished and ended when protection is sought, they
can give no redress whatever. And the reason is manifest: their
injunction being purely preventive, if the wrong is already done
when their power is invoked, they cannot prevent the wrong.
The doing of that which is already done cannot be prevented.
For a past trespass which, as a legal wrong, is complete when
redress is sought, no redress can be given except compensation
in money, by way of damages, and redress in that form cannot
be administered by a court of equity. In cases where the dam--
ages are not susceptible of exact estimation, and where no stand-
ard of measurement exists except such as an experienced judg-
ment will approve, it has been declared by the highest court of
this state that this court cannot admeasure them; but their
admeasurement in all such cases belongs exclusively to the com-
mon law courts. *Palys* v. *Jewett, 5 Stew. Eq. 302.*

Therefore, if the wrong which forms the ground of this action had been committed on the surface, and had consisted of an excavation made in the complainant's land, and also of the removal of a solid stone wall, erected by the complainants on their own land, to prevent the water of a pond standing on the defendants' land from overflowing theirs, and the effect of the defendants' wrongful acts, in making the excavation and removing the wall, had been to produce a continuous discharge of the water of the pond over the complainants' land, which would continue, constantly inflicting additional injury, so long as the wall was not restored, and the complainants had failed to apply for protection while the wrong was in progress, but came seeking it after all force and violence had ceased, and after the defendants' trespass, as a legal wrong, was fully completed, though its injurious consequences were still in progress, I consider it entirely clear on principle that, under such a condition of facts, this court would be powerless to give the complainants any relief whatever. It is certain that the trespass could not be restrained, for, as already remarked, it is impossible to restrain or prevent the doing of that which has already been done. It is equally certain that this court has no power to decree the payment of pecuniary damages in satisfaction of such a wrong. And I know of no power in this court, or in any other, which gives it authority, when one person has made an excavation in the land of another, to command the aggressor to go back and fill up the excavation and restore the land to its original condition. Such a decree would, I think, be entirely anomalous, having the support of neither precedent nor principle. And it would produce this incongruous state of affairs : to redress the first trespass, the court would command the aggressor to commit a second. Nor do I think that this court has power, in such a case, to compel the wrong-doer to erect a wall on his own land to protect the injured party against the consequences of his wrongful act. The practical effect of such an exercise of power, it will be observed, would be to fasten a perpetual easement on the lands of the aggressor as a remedy for a trespass committed by him on the land of his neighbor. I have never understood that it was possible for any such conse-

quence to flow from a trespass, nor that it was possible for an easement to have its origin in such a source. Acts which are wrongful in their origin may be repeated so frequently and so long as to raise the presumption of a grant, and thus to transform what was originally wrongful into a right; but I know of no act which a wrong-doer may do on the land of another which will give the person injured a right of any kind in the land of the wrong-doer.

It would seem, therefore, to be entirely clear that if the trespasses on which the complainants ground their right to relief had been committed on the surface, this court would have been without the slightest pretence of jurisdiction over the case, and that the only remedy to which the complainants could, in that case, have had recourse, would have been an action at law. But the complainants say that their right in this respect is changed by the place where the trespasses were committed, and by the character and consequences of the trespasses. The proposition on which they rest their right to a remedy in equity is this: that the defendants, by their trespasses, having placed the two mines in such position or relation to each other that water rising in the defendants' mine must necessarily, by force of the law of gravitation, flow into that of the complainants, thereby imposed upon themselves, as a consequence of their wrong, a legal duty to prevent the water accumulating in their mine from flowing into the complainants' mine; and that inasmuch as the complainants can only have adequate protection against the injuries which will arise from the violation of this duty by an injunction commanding the defendants to prevent the water in their mine from flowing into the complainants' mine, their right to relief in equity is clear, for the reason that a court of equity is the only tribunal which can effectually and adequately redress their wrong. This proposition, it will be observed, goes to the length of declaring that it is a settled rule of law that a trespass which is complete in everything except its damnifying consequences when suit is brought, will, in a case like the present, raise a duty against the person committing it to do something more, in making redress for it, than to pay pecuniary damages. No such

Lord v. Carbon Iron Manufacturing Co.

duty, it is clear, exists by force of any general principle, and if it exists at all, it must be as an exception to some general rule. According to the rule which prevails generally, if not universally, in such cases, the only legal duty which a trespasser incurs by his wrongful act, where his act, as a legal wrong, is complete when judicial aid is invoked, is a liability to re-imburse the injured person, in money, for all loss, both direct and consequential, which his trespass has caused. If A breaks the windows of B's house, and a rain-storm should afterwards occur before B could, by the exercise of reasonable diligence, have the windows repaired, and his house should, in consequence, be seriously injured by the rain, B, in a suit against A, would be entitled to recover all the damages which his house had sustained, as well those resulting from the destruction of the windows as those subsequently caused by the rain. But B could not leave his windows in the insecure condition in which A's wrongful act put them, and then maintain an action against A for not repairing them. To allow B to maintain an action against A for not repairing the windows would involve this absurdity : A would have no right to enter B's close to repair the windows (if he went there, even for that purpose, he would commit a further trespass), and so if B should be allowed to maintain an action against A for not repairing the windows, his action would rest on A's not doing that which he had no right to do.

The only judicial hint ever given, so far as I am aware, that it was possible for a duty like that which the complainants charge against the defendants to spring from a trespass, was thrown out by Chief-Baron Pollock in disposing of a demurrer to a declaration in *Firmstone* v. *Wheeley, 2 Dowl. & L. 203.* The declaration alleged that the defendant had committed a trespass on the plaintiff's land by removing a barrier which the plaintiff had left there to protect his mine against water accumulating in the defendant's mine, and that, in consequence of the defendant's trespass, the water in his mine, which the barrier, if it had been left undisturbed, would have held back, now flowed into the plaintiff's mine. The declaration then charged that it became the defendant's duty, in consequence of his having unlawfully

removed the only barrier between the two mines, to so deal with the water accumulating in his mine as to prevent it from flowing into the mine of the plaintiff. The chief-baron, in deciding the question raised by the demurrer, said : " There may, perhaps, be a difference, as regards the law, between the barrier of a mine and a fence above ground. If a wall is knocked down, the owner may maintain an action of trespass, but he cannot, by omitting to rebuild it, hold the defendant always responsible for any consequential damages. But here the plaintiff says that the removal of the barrier is irreparable, and therefore the duty alleged in this declaration may well arise." This, it will be seen, is, at most, a mere intimation that such may be the law. The case does not decide that a trespass will create any such duty, and it has never been so understood. Lord Denman, in speaking of it, in Clegg v. Dearden, 12 Ad. & El. (N. S.) 576, 601, said that it had not been determined in that case that any such duty or obligation would flow from a trespass ; and in Smith v. Kenrick, 7 Man., G. & S. 515, 564, the court, in reviewing the last remark attributed to the chief-baron, said that the case could hardly be treated as a decision. If these criticisms of Firmstone v. Wheeley do not show that no such duty exists, they are certainly sufficient to raise serious doubts respecting its existence. Whether it exists or not is a disputed question of law, and while that remains the case no injunction or other equitable relief can be granted. So long as the defendants' duty is in doubt there must also be doubt respecting the complainants' legal right, for if the defendants are not subject to the duty claimed, the complainants are without legal right, and where, as in this case, a complainant asks protection against injury arising from the violation of a legal right, he is not entitled to what he asks unless he can show that the right on which his title to relief rests is settled, as a matter of law.

There is, however, authority declaring directly that no such duty exists. To this extent, I think, the law pertinent to this branch of the case must be considered settled—that for wrongs, like those of which the complainants complain, there is but a single remedy, and that is an action of trespass ; and that the

only duty which a wrong-doer incurs by the commission of such wrongs is a liability to answer in damages for the loss his wrongs have caused. These are the doctrines established by *Clegg* v. *Dearden, supra*. The plaintiff's right of action in that case rested on the same duty which the complainants here seek to fasten upon the defendants. The defendant had broken down a barrier which the plaintiff had left on his land to protect his mine against water rising in the defendant's mine. The parties owned adjoining mines, the plaintiff's being the lower of the two. The plaintiff brought an action of trespass against the defendant, had a recovery, and his damages were subsequently paid. The plaintiff afterwards suffered further damages, damages which were not covered by the previous recovery, and to recover such subsequent damages he brought an action on the case against the defendant for wrongfully keeping open and continuing the aperture between the two mines which he had made in breaking down the plaintiff's barrier. The case was submitted, on a special verdict, to the court of queen's bench, for judgment whether, on the facts above stated, the plaintiff could recover. The court held that he could not. It was said, that leaving the aperture open, in consequence of which the water continued to flow from the defendant's mine into the plaintiff's, afforded no distinct ground of action as for the continuance of a trespass or of a nuisance; the flowing of the water, and the damage thereby caused to the plaintiff was merely consequential to the making of the aperture, and for that the plaintiff had already received compensation. The pith of Lord Denman's argument against the plaintiff's right to recover was expressed as follows : " There is a legal obligation to discontinue a trespass or remove a nuisance, but there is no such obligation upon a trespasser to replace what he has pulled down or destroyed upon the land of another, though he is liable in an action of trespass to compensate in damages for the loss sustained. The defendant, having made an excavation and aperture in the plaintiff's land, was liable to an action of trespass, but no cause of action arises from his omitting to re-enter the plaintiff's land and fill up the excavation. Such an omission is neither a continuation of a trespass

nor of a nuisance, nor is it a breach of any legal duty." Sub-stantially the same views were expressed by the court in *Smith* v. *Kenrick, supra.*

The law, as established by *Clegg* v. *Dearden,* was adopted and enforced in *Williams* v. *Pomeroy Coal Company,* 37 *Ohio St.* 583. The defendants in this case, while working out the coal in their land, broke over the line and took coal belonging to the adjacent owner for a distance of from thirty-six to thirty-nine feet. This trespass was committed in 1861, and the defendants abandoned their mine in 1862. In 1864 the plaintiff acquired title to the land upon which the defendants' trespass had been committed. In 1868, the plaintiff's workmen, while taking out his coal, broke into the excavation made by the defendants, and through the opening thus made, the water which had collected in the defendants' mine was let into the plaintiff's mine and flooded it. The plaintiff subsequently, and after the right of action for the trespass, committed in 1864, had become barred by statute, brought an action to recover the damages which he had sustained by the flooding of his mine. He insisted that the defendants' wrong was, in legal substance, a continuing nuisance; that while it was true their wrong had its origin in the trespass committed in 1861, yet its injurious consequences did not cease with the trespass, but were continuous, those most remote causing the utter ruin of his mine, and the damnifying consequences of the wrong should, therefore, be treated like the injuries inflicted by other continuing nuisances, and be adjudged to be the proper basis of successive actions. The court refused to adopt this view, but, on the contrary, held that the case was one of simple tres-pass, and not of nuisance, and that any bar or extinguishment of the right of action for the trespass, whether it arose from lapse of time or a prior recovery, absolved the defendants from all liability for the trespass or any of its consequences.

A recent decision of the supreme court of Michigan adopts the doctrine laid down in these two cases in all its length and breadth. The case referred to is the *National Copper Co.* v. *Minnesota Mining Co., 57 Mich.* The plaintiff and defendant owned adja-cent copper mines, each holding its land in fee. The plaintiff,

in working out its ore, left a wall of rock, from fifteen to eighteen feet thick, next to the defendant's mine. The defendant left no barrier, but, in taking out its ore, worked not only up to the boundary line, but over it, breaking into the plaintiff's mine at two different points, at one of which its trespass extended over on the plaintiff's land about twenty feet. The plaintiff subsequently, in making blasts in its mine, broke into the excavations, and openings were thus made between the two mines, by which the water in the defendant's mine was let into that of the plaintiff. The defendant afterwards abandoned its mine, first robbing it, by taking out all the ore which had been left for supports. In consequence of the removal of the supports, the surface of the defendant's mine caved in, and depressions were thus made, into which the water, produced by rains and melting snow, collected, and then sank into the defendant's mine, and from there flowed, through these openings, into the plaintiff's mine. The plaintiff, after its right of action for the original trespass was barred by statute, brought an action against the defendant. It put its right to maintain its action on two grounds: first, that the defendant's trespass was a continuing wrong; and second, that the defendant, having wrongfully removed the barrier which the plaintiff had left for the protection of its mine, and thereby caused the water in the defendant's mine, which the barrier would, if it had been left undisturbed, have kept there, to flow into the plaintiff's mine, thereby, as a legal consequence of its wrong, imposed upon itself an obligation either to close the openings, or to prevent the water in its mine from flowing through them into the plaintiff's mine. The plaintiff recovered a judgment for a large sum in the court of original jurisdiction. The case was then removed to the supreme court, and there both grounds taken by the plaintiff were declared fallacious. Chief-Justice Cooley, who pronounced the opinion of the court, said, in discussing the plaintiff's first ground: "The case before us was one of admitted trespass, from which immediate damage resulted. Had suit been brought at that time, all the natural and probable damage to result from the wrongful act would have been taken into account, and the plaintiff would have re-

covered it.    But there was no continuous trespass 'from that time on.    The defendant had built no structure on the plaintiff's premises; was occupying no part of them with anything it had placed there, and was in no way interrupting the plaintiff's occupation or enjoyment.    All it had left there was a hole in the wall.    But there is no analogy between leaving a hole in a wall on another's premises and leaving houses or other obstructions there to encumber or hinder his occupation.    Physical hinderances are a continuance of the original wrongful force, but the hole is only the consequence of a wrongful force, which ceased to operate the moment the hole was made."    The chief-justice then discusses the second ground taken by the plaintiff, with more elaboration and a greater wealth of illustration than it is discussed in either *Clegg* v. *Dearden* or *Williams* v. *Pomeroy Coal Company*, but he rests his repudiation of it, at last, on the principle established by those cases.

On the important question whether the remedy given by the common law, in cases of this kind, where the damages flowing from a trespass contemporaneous with its commission, or shortly afterwards, may be very insignificant in comparison with those which may result from it at a date long subsequent to its commission, is adequate to enable a court of law to do full and complete justice to the person aggrieved, the chief-justice speaks as follows: "The wrong to the plaintiff consisted in breaking down the wall which had been left by it in its operations.    If any damage might possibly result from this, which was not then so far probable that a jury could have taken it into account in awarding damages, the plaintiff was not without redress.    It would have been entitled, in a suit then brought, to recover the costs of restoring the barrier which had been taken away; and if it had done so, and made the restoration, the damage now complained of could not have happened.    It thus appears that complete redress could have been had in a suit then brought, and that being the case, the plaintiff is not entitled to recover now for an injury for which an award of the means of prevention was within the right of action, which was suffered to become barred.    The right which then existed, being a right to recover

Lord v. Carbon Iron Manufacturing Co.

for all the injury that had been suffered, including the loss of the dividing barrier, it would not have been competent for the plaintiff, had suit then been brought, to leave the loss of the barrier out of account, awaiting possible special damages to flow therefrom as a ground for a new suit. The wrong which had then been committed was indivisible, and the bar of the statute must be as broad as the remedy was which it extinguishes." These adjudications make it entirely clear that the wrongful acts imputed to the defendants imposed no such duty upon them as that which the complainants seek to fasten upon them; and they also demonstrate that the only remedy to which the complainants could ever have had recourse for the redress of the wrongs of which they complain was an action of trespass.

So far the case has been considered as though the defendants had themselves committed the trespasses of which complaint is made, and also as though the damages, against which protection is sought, were all caused by the unlawful acts of the defendants, and were therefore legally chargeable against them. This, however, is not the fact. The defendants committed neither trespass, nor is it true that all the damages the complainants have since sustained resulted from the trespasses. They were, to a large extent, self-inflicted. As already remarked, the proofs show that the complainants' shaft was judiciously located, and also, that in carrying their shaft down, it was impossible to avoid breaking into the upper excavation. But so long as their mine did not extend below the first excavation, an opening between the two mines, at this point, could do the complainants no harm, but, on the contrary, would be advantageous. It would provide them with a way by which their mine could be relieved of all the water accumulating in it above this point, without pumping it to the surface. Their superintendent says that this was one of the advantages which he had in view in selecting the site for the shaft. The injury which the complainants' mine now suffers from this opening is inflicted at a point far below the opening, and is caused by the flowage of water rising in the defendants' mine, through the opening, into the complainants' mine. The complainants carried their mine on down below the opening, not

Lord v. Carbon Iron Manufacturing Co.

only with full knowledge that the opening was there, but also knowing what would be the inevitable effect upon their mine if they sunk it below the opening without first erecting a barrier across the opening. The erection of a barrier at this point was one of the things which the complainants' superintendent had in contemplation when he selected the site for the shaft. He says that he intended, if it became necessary for the protection of the complainants' mine after an opening had been made, to build a barrier across the opening, and that he thought that this course would be less expensive than to sink the shaft at any other point, or to so alter the course of the shaft as to avoid breaking into the excavation.

In view of these facts there can be no dispute that the injuries against which the complainants seek protection are largely, if not entirely, due to causes which the complainants have themselves created. It is certain that if they had not sunk their mine below the opening, or if, before carrying it below that point, they had erected a sufficient barrier across the opening, none of the injuries of which they now complain could have happened. Their injuries have been caused by what they did and by what they omitted to do. And this is true of both sources of injury; of both the upper and lower opening. The complainants had an unquestionable right to sink their mine below the opening; but the fact that they knew that the opening was there, and that if they left the opening in just the condition they found it, they would expose their mine to constant and serious danger, made it their duty to do what they could to protect their mine against injury from this source. A wrong-doer is not liable for such damage as the injured person may easily avoid by his own act. The rule is settled, that if the damages resulting from a trespass are aggravated or increased by the folly, willful obstinacy or gross carelessness of the person injured, such part of his loss as is directly attributable to his own fault cannot be recovered. *1 Suth. on Dam. 148; Field on Dam. § 126; Loker v. Damon, 17 Pick. 284.*

For these reasons, I am of opinion that the first measure of relief asked by the complainants must be denied.

The threatened or prospective injury against which the complainants ask protection is that which they fear their mine will sustain in case the surface of the defendants' mine subsides. The complainants allege that the defendants intend to reduce the pillars which were left in their mine, while they were working it, for the support of the stratum immediately above them, and that they also intend to take the ore from the walls of their mine; that the pillars and walls are now too weak to furnish sufficient support for the stratum above them, and that if their strength is further impaired by the removal of additional ore, the inevitable effect will be the caving in of the surface of the defendants' mine, and that the cavity thus made will serve as a conduit to pass into the complainants' mine a large quantity of surface water, which, if the surface is left in its natural condition, will flow off over the surface and never reach the complainants' mine. The complainants also allege that as the Rockaway river flows near the workings of the defendants' mine, there will be great danger, in case a subsidence occurs, that the water of the river will be precipitated into the cavity made by the subsidence, and from there into the defendants' mine, and then, through the two openings, into the complainants' mine. The defendants do not deny that they intend to remove, according to the customary methods, all the ore which remains in their mine, and which can be removed with profit; nor do they deny that the removal of the ore may cause the surface of their mine to subside; nor that in case a subsidence takes place, some damage may not be done to the complainants' mine, but they insist that if any damage should result to the complainants' mine from that cause, they cannot be held answerable for it, either here or elsewhere. The defendants do, however, deny that in case the surface of their mine should subside, that the slightest damage will thereby be created; that the water of the Rockaway river may be thrown into the complainants' mine, and the proofs in support of their averment, in that regard, seem to render it perfectly clear that there is not, at present, the least reason to fear that the complainants will ever suffer any injury from that cause.

The first question, then, which this branch of the case would

seem to present is this, Have the defendants a right, by law, to remove all the ore from their mine, regardless of the effect which the removal may have on the mine of the complainants? It is to be assumed, of course, that the work necessary to be done in the removal of the ore is to be done in a skillful and proper manner. The parties to this litigation stand free from all covenant obligations to each other. They each own their land in fee, and have all the property rights in it which an absolute and independent title can give. There can be no doubt that the rule is settled that where one person makes a grant of land to another, reserving the minerals in the land, a covenant will be implied, in the absence of all words to that effect and solely from the nature of the transaction, that the grantor, in removing the minerals reserved, shall leave or provide sufficient support for the surface to prevent its subsidence. And the same implication will arise where grants are made of different strata, one above the other, to different persons. This rule is founded on the familiar maxim that whoever grants a thing shall be understood to grant also whatever is indispensable to the full beneficial enjoyment of the thing granted. *Harris* v. *Ryding*, *5 M. & W. 60; Hilton* v. *Earl Granville, 5 Ad. & El. (N. S.) 701; Mundy* v. *Duke of Rutland, L. R. (23 Ch. Div.) 81.* But it is manifest that this rule has no application to this case.

The two general rules which must control the decision of this branch of the case may be stated as follows: first, land on a lower level is under a natural servitude to that located above it, to receive the water flowing down to it naturally; and second, for damages resulting from natural causes or from lawful acts done in a proper manner, the law gives no redress, such losses being regarded as *damnum absque injuria,* but where one of two adjoining mine owners conducts water into his neighbor's mine, which would not otherwise go there, or causes it to go there at different times and in larger quantities than it would go there naturally, he commits a wrong which the law will redress. The second of these rules states the principle to be deduced from two adjudications, which have received the approval of the highest judicial tribunal of Great Britain. They are both cited in *Ry-*

*lands* v. *Fletcher*, *L. R.* (*3 H. of L.*) *330*, as correct expositions of the law.    The first declares that it is the natural right of each of the owners of two adjacent mines, neither being subject to any servitude to the other, to work his own in the manner most convenient and beneficial to himself, although the natural consequence may be that some prejudice will accrue to the owner of the adjoining mine, so long as that does not arise from negligent or malicious conduct.    *Smith* v. *Kenrick, 7 C. B. 515*.    And the second says that the occupier of the higher mine has no right to be an active agent in sending water down into the lower mine.    The lower mine is subject to no servitude of receiving water, conducted by man, from the higher.    Each mine owner has all rights of property in his mine, and among them the right to get all minerals therefrom, provided he works with skill and in the usual manner.    And if, while the occupier of a higher mine exercises that right, nature causes water to flow to a lower mine, he is not responsible for this operation of nature.    If the owner of the lower mine intends to guard against this operation, he must leave a barrier at the upper part of his mine to bay back the water of his higher neighbor.    The law imposing these regulations for the enjoyment of somewhat conflicting interests does not authorize the occupier of the higher mine to interfere with the gravitation of the water, so as to make it more injurious to the lower mine or advantageous to himself.    *Baird* v. *Williamson, 15 C. B.* (*N. S.*) *376*.

And here it may not be improper to say that the value of the minerals in the soil of Great Britain, and the importance of mining as one of the great industries of that country, as well as the frequency with which its courts have been called upon to decide controversies respecting the rights and duties of mine owners, render it quite certain that questions like the one under consideration have received the very best consideration which it was possible to give them, and the decisions of the courts of that country, on such questions, are therefore entitled to the very highest respect.

The application of the leading principle established by the two cases just cited, to the case in hand, has been made easy and

simple by a judgment pronounced by the house of lords in 1876. That case and the one under consideration are identical in all their material parts, except in that case a subsidence had actually taken place, and some of the injury consequent to the subsidence had been actually sustained, while here damage is simply apprehended. The following are the material facts of that case, as given in the opinion of Lord Blackburn, who pronounced the judgment of the house of lords: The plaintiff and defendant were the lessees of the minerals under two adjacent parts of the same estate. The defendant's seam of coal cropped out at the surface and lay at a high inclination, dipping towards the seam in the plaintiff's holding, and entering the plaintiff's seam at a point many fathoms below the surface, so that any water which fell on or percolated into the defendant's holding, would, necessarily, by force of gravitation, descend to the plaintiff's holding, unless stopped by the minerals or soil from doing so. The soil above the coal was stiff and impervious to water, so that while it remained undisturbed, the greater part of the rain-fall flowed away over the surface, very little filtering down to the seam, which was, in consequence, a very dry seam, the impervious strata above, while it remained undisturbed, forming what might be called a roof, practically water-tight, over the coal. The defendant altered this state of affairs. He worked out his coal, carrying away the whole of it, and, as a necessary result, the surface sank. At the upper part, where the seam cropped out to the surface, the subsidence was so great over about five acres, that the surface sank into pits and cracked into open fissures, through which the rain which fell on these five acres flowed down into the defendant's workings, and the coal in these workings having been removed, the water in the defendant's mine flowed down towards the plaintiff's holding, and in consequence a considerable quantity of water which, whilst the roof remained in its original state, a water-tight roof, had flowed away over the surface, descended into the plaintiff's mine, and he was in consequence put to additional expense in freeing his mine from water. To recover compensation for the loss thus sustained, the plaintiff brought an

action. He was defeated in the courts below, and then carried his case to the house of lords.

Lord Blackburn, in pronouncing judgment, stated that it seemed to him the question to be decided was whether the loss the plaintiff had sustained was not *damnum absque injuria*, against which he was bound to protect himself in the best way he could, or whether the defendant, while working the upper mine, was under any obligation to the plaintiff to preserve or restore the impervious roof, which, whilst it existed, prevented the greater part of the rain-fall from descending to the plaintiff's mine. He then said: "The general rule of law is that the owner of one piece of land has a right to use it in the natural course of user, unless in doing so he interferes with some right created either by law or contract; and, as a branch of that law, the owner of mineral land has a right to take away the whole of the minerals in his land, for such is the natural course of the user of mineral land, and that a servitude to prevent such a user must be founded on something more than neighborhood." Quoting then from Lord Cairns, in *Rylands* v. *Fletcher*, he said that the occupier of a close may use it for any purpose for which it may, in the ordinary course of the enjoyment of land, be used; and that if, in the course of such user, water accumulates on his land, either on the surface or under ground, and then, by the operation of the laws of nature, passes off into the close of the plaintiff, the plaintiff has no legal cause of complaint. He also said: "I may observe that I cannot see any principle on which an obligation for the benefit of the owners of the coal on one dip, to restore the surface to its natural state of water-tightness, can be founded, which would not equally give rise to an obligation to make the underground workings as water-tight as they were before the coal was removed." *Wilson* v. *Waddell, L. R. (2 App. Cas.) 95.* Subsequently the same tribunal declared, in *Fletcher* v. *Smith, L. R. (2 App. Cas.) 781*, that, after the decision in *Wilson* v. *Waddell*, the court could not be asked to hold that a defendant was liable as for a wrongful act, for removing the coal from his land, and thereby opening the soil above his mine, so as to let through, into the plaintiff's mine, the rain water

12

which might fall on the surface of the defendant's mine.   And just in this connection, I think it should be noticed that all the injuries which the complainants fear, but have not suffered, had actually been sustained by the plaintiffs in the *National Copper Co.* v. *Minnesota Mining Co.*, and yet the court was compelled to declare, in that case, that as the plaintiffs had lost their right of action for the trespass, they were remediless.

These adjudications are directly in point.   They stand upon a principle universally recognized as just—namely, the right of every land-owner to have the full, free and perfect enjoyment of his land, for all purposes for which land may rightfully be held and enjoyed ; and they demonstrate, beyond all question, that if this right be accorded to the defendants in this case, the complainants are without the least title to any kind of equitable relief.

The question whether if the defendants remove the ore remaining in their mine, and a subsidence shall, in consequence, take place, and the injuries which the complainants now fear shall actually happen, they may then have a right to maintain an action against the defendants, under the doctrine laid down in *Backhouse* v. *Bonomi, 9 H. of L. Cas. 503,* and *Darley Mam Colliery Company* v. *Mitchell, L. R.* (*11 App. Cas.*) *127* (and which doctrine is stated more clearly and forcibly by Chief-Justice Cockburn, in *Lamb* v. *Walker, L. R.* (*3 Q. B. Div.*) *389,* than it has ever been stated by any other judge), cannot be considered now, and probably may not be a proper subject for the consideration of this court until it has been considered and determined by the supreme court of this state.

My judgment on the whole case is that the complainants are not entitled to either measure of relief asked, and their bill must therefore be dismissed, with costs.